IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

STACY ANTONIO SCOTT, JR.,
FL DOC #X59632,

      Plaintiff,

v.                                     CASE NO. 1:18-cv-10-GRJ

DONALD L. PERRY, et al.,

      Defendants.

_____/

## ORDER[1]

      This is a civil rights action pursuant to 42 U.S.C. § 1983, in which

Plaintiff, a *pro se* inmate in the custody of the Florida Department of

Corrections, has pleaded excessive force, deliberate indifference, and

state-law claims against corrections officers and medical professionals who

were employed at Cross City C.I. on March 13, 2015, when Plaintiff

inadvertently fell in the prison shower and injured his ankle.  ECF No. 78.

      Pending before the Court are two dispositive motions filed by

Defendants.  The first is Sergeant Donald L. Perry and Officer Jeremiah

Braswell's Motion to Enforce the Parties' Settlement Agreement.  ECF No.

---

[1] The parties consented to the undersigned conducting any and all proceedings in this case, including a trial and ordering the entry of a final judgment.  ECF Nos. 35, 60; *see also* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  Therefore, any appeal from the entry of a judgment lies directly to the United States Court of Appeal for the Eleventh Circuit.  28 U.S.C. § 636(c)(3).

124.  Plaintiff has filed a separate "Motion to Set Aside and Vacate Settlement Agreement," ECF No. 130, which the Court construes as a response in opposition to Sergeant Perry and Officer Braswell's motion.[2] The second is Dr. Asbelti Llorens and Nurse Debra Phillips' Motion for Summary Judgment.  ECF No. 126.  Plaintiff has filed a response in opposition to the Motion for Summary Judgment.  ECF No. 127.  Dr. Llorens and Nurse Phillips filed a reply memorandum, ECF No. 129.

Defendants' motions are ripe for consideration.  For the reasons discussed below, Sergeant Perry and Officer Braswell's Motion to Enforce the Parties' Settlement Agreement, ECF No. 124, and Dr. Llorens and Nurse Phillips' Motion for Summary Judgment, ECF No. 126, are due to be **GRANTED**.  Accordingly, this case will be **DISMISSED with prejudice**.

## I.  BACKGROUND

### A.    Plaintiff's Injury and Medical Treatment

On March 13, 2015, at about 7:20 p.m., Plaintiff was attempting to exit a shower in his prison dormitory when his foot became trapped on the shower ledge.  ECF No. 78 at 7.  He fell sideways, in an attempt to break his fall, causing his right foot to "snap" at an "unnatural angle."  *Id.*

---

[2] Accordingly, the Clerk is directed to **TERMINATE** this motion (ECF No. 130).

Six hours later, at about 1:30 a.m., Plaintiff was carried downstairs from his dormitory and transported to the prison medical department for an examination of his injury by Nurse Phillips.  ECF No. 127-4 at 2.  Plaintiff showed Nurse Phillips the "unnatural swelling" in his foot, which, he says, "hung limp due to the fluid rising up to [his] knee."  *Id.*  Nurse Phillips notified the physician, Dr. Llorens, who ordered her to give Plaintiff an ice pack for 24 hours, crutches, an ankle brace, 30 mg of Toradol, Ibuprofen, and a "rest pass."  ECF No. 127-1 at 3.  Dr. Llorens also ordered Plaintiff to return to the medical department two days later, on March 16, for further examination and on March 18 for an x-ray.  *Id.*  Plaintiff was instructed to immediately report any skin discoloration, tingling, numbness, or an increase in pain.  *Id.* at 4.  Plaintiff asserts that he told Nurse Phillips he could not take Ibuprofen because it "would give [him] a severe migraine and elevate [his] blood pressure," but she refused to give him an alternative medication.  ECF No. 127-4 at 3.

When Plaintiff returned to his dormitory from the medical department, he informed Sergeant Perry and Officer Braswell that he could not climb the stairs because he was in too much pain to lift his foot.  ECF No. 78 at 8. After several minutes, Sergeant Perry and Officer Braswell grabbed both of Plaintiff's arms, causing his crutches to fall, and forced him up the stairs.

3

*Id.*  In the process, Plaintiff's crutches fell down the stairs and his foot struck several steps.  *Id.*  Plaintiff also alleges that Sergeant Perry and Officer Braswell referred to him using disparaging terms during this encounter.  *Id.*

Plaintiff spent the next two days in his cell experiencing, what he describes now as, "severe, excruciating, intolerable pain" because corrections officers refused to escort him to the restroom.  ECF No. 127-4 at 3.  Plaintiff's ankle continued to throb, and his toes became "numb, swollen, and discolored."  *Id.*

Plaintiff was seen by Dr. Llorens on March 16 when he returned to the medical department.  ECF No. 127-1 at 9.  Plaintiff asserts that Dr. Llorens "had an attitude" during his examination, as evidenced by Dr. Llorens being "hostile and insensitive toward" Plaintiff.  ECF No. 127-4 at 4.  Nevertheless, Dr. Llorens observed Plaintiff's injury, without physically touching it, and prescribed Plaintiff 400 mg of Ibuprofen.  *Id.*  Plaintiff advised Dr. Llorens that the Ibuprofen "would not relieve [his] pain, make [the pain] worse, [and] cause [him] to suffer migraines [and] nausea to the point of vomiting, lightheadedness, and severe abdominal pain."  *Id.*  Like Nurse Phillips, Dr. Llorens refused to prescribe Plaintiff an alternative medication.  *Id.*

Plaintiff underwent an x-ray of his ankle and foot on March 18.  ECF

No. 38 at 5.  The images revealed a "minimally displaced fracture of the

medial malleolus" in Plaintiff's right ankle and a "nondisplaced fracture of

the distal fibula at the ankle mortise," as well as soft tissue swelling.  *Id.*

There was no fracture, dislocation, subluxation, or abnormal soft tissue in

Plaintiff's right foot.  *Id.* The radiologist's only recommendation to Plaintiff

was to "[f]ollow up as clinically indicated[.]"  *Id.*

Dr. Llorens was notified of the x-ray results and advised Plaintiff he

would refer him to an orthopedic specialist.  ECF No. 78 at 9; ECF No. 127-

4 at 4.  Plaintiff complained again about the side effects of the Ibuprofen

and the pain, numbness, and discoloration in his ankle, but Dr. Llorens did

not change his medication, advised Plaintiff he "don't have to take the shit,"

and told him to go to "sick call."  ECF No. 127-4 at 4.

On March 23, Dr. Llorens formally referred Plaintiff to an orthopedic

specialist for an appointment two weeks later, on April 7.  ECF No. 38 at 7;

ECF No. 127-1 at 13; ECF No. 127-4 at 5.  Dr. Llorens also changed

Plaintiff's prescribed medication from Ibuprofen to a combination of

Naproxen and Excedrin.  ECF No. 127-1 at 11; ECF No. 127-4 at 5.

Plaintiff told Dr. Llorens that he did not have a "tolerance" for Naproxen

because it made him nauseous.  ECF No. 127-4 at 5.  Dr. Llorens refused

5

to prescribe him another pain medication, and Plaintiff continued to experience "severe, excruciating, intolerable pain" until his consultation on April 7 with orthopedist Dr. Carlos Esquiva.  *Id.*

During his consultation with Dr. Esquiva, Plaintiff underwent additional x-ray imaging, which revealed "mild diffuse soft swelling," "anatomic alignment" of the "medial malleolus fracture" (in a "good position for healing"), and unchanged alignment to the "oblique fracture of the distal fibula[.]"  ECF No. 38 at 8.  Dr. Esquiva recommended Plaintiff use a well-padded ankle brace for three months and prescribed 500 mg of Naproxen for 60 days (notwithstanding Plaintiff's complaint that it made him nauseous).  ECF No. 127-1 at 14.  Dr. Esquiva further advised Plaintiff to return in three months for a follow-up appointment.  *Id.*  Plaintiff asserts that when the explained severity of his ankle and leg pain that Dr. Esquiva informed him that his ankle fracture healed in a displaced manner because Dr. Llorens misdiagnosed the fracture as "routine."  ECF No. 127-4 at 6.  Dr. Esquiva explained to Plaintiff that any recommendation to "reset" the injury would be denied because of Plaintiff's "youth" and his "ability to heal quick and proper without surgical intervention."  *Id.*

Plaintiff visited the medical department on April 8 and April 13 to complain to Dr. Llorens about his continued leg and foot pain and the side

6

effects of his prescribed medication.  *Id.* at 6–7; *see also* ECF No. 38 at 9–
10.  During the latter visit, Dr. Llorens confiscated Plaintiff's crutches,
advised Plaintiff to use the Naproxen and ankle brace prescribed by Dr.
Esquiva, and directed him to return on July 15 for a follow-up x-ray.  ECF
No. 38 at 10; ECF No. 124-4 at 7.

Plaintiff's third x-ray, taken on July 15, revealed the two fractures
discussed above but otherwise indicated "anatomic alignment at the ankle
mortise," "no joint effusion," normal and uniform bone density, normal "soft
tissue planes," and "no plantar spur."  ECF No. 127-1 at 23.  Plaintiff
returned to the medical department two days later, on July 17, for a follow-
up examination by Dr. Llorens.  ECF No. 127-1 at 17; ECF No. 127-4 at 8.
Dr. Llorens advised Plaintiff that he canceled his follow-up visit with Dr.
Esquiva because the fracture was healed and Plaintiff demonstrated full
range of motion in his ankle.  ECF No. 127-1 at 17; ECF No. 127-4 at 8.
Plaintiff again complained about the swelling and pain extending from his
right foot to right knee and "an obvious deformity and displacement" in his
right ankle.  ECF No. 127-4 at 8.  Dr. Llorens told Plaintiff he would not
prescribe a different medication and that any follow-up appointment with
Dr. Esquiva would be futile because Dr. Esquiva would not recommend
corrective surgery for a minor injury.  ECF No. 127-4 at 9.

Plaintiff states, without citation to any medical record, that between July 2015 and October 2015 he learned his ankle fracture did not heal and required "surgical intervention to stabilize it."  ECF No. 127-4 at 9.  After Plaintiff was transferred to Franklin Correctional Institution in late 2015, he visited the clinic there for an examination of his right ankle based on the same complaints he raised with Dr. Llorens.  ECF No. 78 at 10.  The physician advised Plaintiff there was no course of treatment based on the "way his ankle fracture healed" and continued to prescribe him Naproxen. *Id.*

Plaintiff then underwent a fourth x-ray on July 1, 2016.  ECF No. 127-1 at 24.  The radiologist determined: (1) there was "no radiographic evidence of acute fracture or dislocation"; (2) the "ankle mortise" was "intact"; (3) there was normal bone mineralization; and (4) there was "mild medial and lateral soft tissue swelling."  *Id.*

Plaintiff continued to seek treatment for the chronic pain in his right ankle.  ECF No. 78 at 11; ECF No. 127-1 at 25; ECF No. 127-4 at 10.  Most recently, on July 3, 2019, Plaintiff was referred for an x-ray of his right ankle, which showed a "chronic medial malleolar fracture deformity" as a result of a "high ankle sprain/injury."  ECF No. 127-1 at 26.  Plaintiff alleges he currently experiences "chronic severe pain," that he cannot exercise or

8

participate in other physical activities, and that he cannot stand for prolonged periods of time.  ECF No. 127-4 at 10.

### B.    Plaintiff's Constitutional and State-Law Claims

In his Third Amended Complaint, Plaintiff raises a constitutional excessive force claim against Sergeant Perry and Officer Braswell (Count I), a constitutional claim of deliberate indifference against Sergeant Perry (Count III), and a state-law battery claim against Sergeant Perry and Officer Braswell (Count VIII).  ECF No. 78 at 13–16, 19–20.  Plaintiff also asserts three claims against Dr. Llorens and Nurse Phillips concerning the quality of his medical treatment at Cross City C.I.  In Counts II and VII, Plaintiff avers that Dr. Llorens was deliberately indifferent to his serious medical needs by failing to appropriately treat his ankle fracture and related chronic severe pain and by delaying the referral to an orthopedic specialist.  ECF No. 78 at 14–15, 18–19.  In Count VI, Plaintiff alleges that Nurse Phillips was negligent because she breached her duty of reasonable care by refusing to accommodate Plaintiff in the inmate infirmary after his fall or, alternatively, by refusing to issue him a temporary "low-tier" pass so he would not have to take the stairs up to his dormitory.  *Id.* at 17–18.  Plaintiff says this resulted in further injury to his right foot when Sergeant Perry and

9

Officer Braswell carried him upstairs to his dormitory, as described above, and when he fell in the same shower "several more times[.]"  *Id.* at 18.

## C.   Plaintiff's Settlement Agreement with Sergeant Perry and Officer Braswell

While the parties were engaged in discovery on Plaintiff's claims, Sergeant Perry and Officer Braswell filed a Notice of Settlement.  ECF No. 114.  Their notice, dated January 30, 2020, advised the Court that they reached a settlement in principle with Plaintiff and requested 30 days to execute a settlement agreement, fulfill the terms of the settlement, and file a joint notice for voluntary dismissal.  *Id.* at 1.  On February 5, the Court entered an order acknowledging receipt of the notice and extending the parties' discovery and dispositive motions deadlines.  ECF No. 116.

One month later, on March 6, Plaintiff filed a motion to set aside and vacate his settlement agreement with Sergeant Perry and Officer Braswell. ECF No. 117.  Plaintiff claimed that the settlement was the product of duress, namely, alleged repeated representations from Defendants' counsel that she would seek to have Plaintiff held in contempt of court for refusing to engage in settlement negotiations and (once a settlement in principle was agreed to) for refusing to execute the settlement agreement. *Id.*  The Court denied the motion as premature because the parties had not filed a joint notice of voluntary dismissal and Sergeant Perry and Officer

10

Braswell had not filed a motion to enforce an executed settlement agreement.  ECF No. 121 at 6.  There was, therefore, "nothing before the Court to set aside or vacate based on Plaintiff's representations in his motion."  *Id.*  The Court advised Plaintiff he could raise his allegations of impropriety should the putative settlement agreement come before the Court.  *Id.*

Sergeant Perry and Officer Braswell filed the instant motion on April 12, 2020.  The parties provide detailed accounts of their settlement discussions and each other's alleged conduct, but the Court will only recount what is relevant to the resolution of this motion.

In sum, there were four relevant communications between the parties.  First, at Plaintiff's deposition on January 14, 2020, Defendants' counsel says that Plaintiff made an oral settlement offer to resolve the claims against Sergeant Perry and Officer Braswell for $5,000.  ECF No. 124 at 1–2.  Plaintiff alleges he refused to make a settlement offer but did so only when Defendants' counsel "became hostile" and threatened him with "contempt of court for refusing to cooperate in the discovery process[.]"  ECF No. 130-1 at 1–2 (Declaration of Plaintiff, dated May 4, 2020).  Plaintiff withdrew that settlement offer in a letter to Defendants' counsel that same

day, in which he thanked her for treating him with "professionalism and courtesy" during the deposition.  ECF No. 117 at 11.

Second, during a telephone call between Defendants' counsel and Plaintiff on January 30, 2020, Defendants' counsel says she presented to Plaintiff a $2,500 counteroffer, which, ultimately, Plaintiff accepted.  ECF No. 124 at 2–3.  Plaintiff alleges that Defendants' counsel was persistent that he accept the counteroffer, became "agitated and hostile," and told Plaintiff that he "had no other option but to proceed with settlement" or she would have his case "tossed out with prejudice for non-compliance."  ECF No. 130-1 at 3.  Plaintiff contends further that he ended the telephone call without accepting the offer, but Defendants' counsel emailed the proposed Settlement and Release of All Claims and tax forms to his classification officer.  *Id.* at 4.

Third, during a telephone call between Defendants' counsel and Plaintiff on February 3, 2020, Defendants' counsel says that Plaintiff began the conversation "by insisting that he had changed his mind regarding his willingness to settle" but agreed, again, to the $2,500 counteroffer and executed a Settlement and Release of All Claims.  ECF No. 124 at 4–5.  Plaintiff alleges that he initially refused to execute the settlement agreement and continued to decline the $2,500 counteroffer but eventually

12

did so when Defendants' counsel threatened him with contempt of court proceedings, the imposition of a daily fine until he executed the agreement, and dismissal of his case with prejudice.  ECF No. 130 at 4.

After the call, Plaintiff's classification officer scanned the executed document and sent it to Defendants' counsel.  ECF No. 124 at 5. Defendants' counsel signed the Settlement and Release of All Claims on behalf of Sergeant Perry and Officer Braswell, mailed Plaintiff a copy of the fully executed settlement agreement, and submitted the agreement to the Department of Financial Services Division of Risk Management for payment of the settlement funds.  *Id.*; *see also* ECF No. 124-1 (executed Settlement and Release of All Claims).  The Settlement and Release of All Claims states expressly that Plaintiff "releases, acquits, and discharges" Sergeant Perry and Officer Braswell "from any and all claims, actions, causes of actions," etc., "at issue" in this case for consideration of $2,500. ECF No. 124-1 at 1.  Moreover, the parties agreed to file a joint notice of voluntary dismissal to "accomplish … discharge of the parties contemplated herein."  *Id.* at 2.

The Department of Financial Services deposited $2,500 into Plaintiff's DOC trust fund account on March 2, 2020.  ECF No. 124 at 5; *see also* ECF No. 124-2 (Plaintiff's DOC trust fund account statement for March 2,

2020, through March 19, 2020).  DOC applied $197.94 to Plaintiff's postage liens and, on March 5, 2020, transferred the remainder ($2,302.06) to Plaintiff's resident account at Blackwater Correctional Institution.  ECF No. 124-2 at 2–3.  Between March 11, 2020, when the check was deposited in Plaintiff's resident account, and March 19, 2020, Plaintiff used the funds to pay for legal postage, purchase items from the commissary, and obtain copies of his medical records.  ECF No. 124-3 (Plaintiff's Blackwater C.I. resident account summary, dated March 19, 2020).

Fourth and finally, during a telephone call between Defendants' counsel and Plaintiff on March 19, 2020, Defendants' counsel says that Plaintiff refused to execute a joint notice of voluntary dismissal and stated he opposed any motion to enforce the settlement agreement.  ECF No. 124 at 6.  Plaintiff does not address this telephone conference in his declaration.  ECF No. 130-1.

## II.  SERGEANT PERRY AND OFFICER BRASWELL'S MOTION TO ENFORCE THE PARTIES' SETTLEMENT AGREEMENT

Sergeant Perry and Officer Braswell argue that this Court should enforce the terms of the parties' settlement agreement—namely, dismissal of Plaintiff's claims against them—because Plaintiff may not unilaterally repudiate the agreement.  ECF No. 124 at 8.  Moreover, Sergeant Perry and Officer Braswell contend that Plaintiff ratified the agreement by

14

"continuing to keep and spend the settlement funds[.]"  *Id.* at 8–10.

Defendants' counsel states in the instant motion that she did not coerce or

threaten Plaintiffs during any of their settlement discussions, *id.* at 2–4, and

provides a declaration from Assistant Attorney General Gecelyne Dixon,

who observed Defendants' counsel's telephone calls with Plaintiff, ECF No

124-4 (Declaration of AAG Dixon, dated March 27, 2020).

Plaintiff asks the Court to vacate the settlement agreement—and to

deny the motion to enforce the settlement agreement—because the

settlement was a product of Defendants' counsel's coercion, duress, and

undue pressure.  ECF No. 124 at 5.  Notably, Plaintiff does not address

Defendants' ratification argument.  *Id.* at 5–7.

## A.    Legal Standard

The Court may "enforce a settlement agreement … when one party

refuses to abide by the agreement prior to dismissal of the action."  *Kent v.*

*Baker*, 815 F.2d 1395, 1400 (11th Cir. 1987); *see also BP Prods. N. Am.,*

*Inc. v. Oakride at Winegard, Inc.*, 469 F. Supp. 2d 1128, 1132 (M.D. Fla.

2007).  This motion is an equitable action for specific performance, which

the Court may resolve without a jury, *Ford v. Citizens and S. Nat'l Bank,*

*Cartersville*, 928 F.2d 1118, 1122 (11th Cir. 1991), and an evidentiary

hearing unless there is "a substantial factual dispute as to the terms of the

settlement," *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994).

When resolving a motion to enforce a settlement agreement, the Court must apply Florida law.  *See Vinnett v. Gen. Elec. Co.*, 271 F. App'x 908, 912 (11th Cir. 2008) ("We use the applicable state's contract law to construe and enforce settlement agreements." (citing *Ins. Concepts, Inc. v. W. Life Ins. Co.*, 639 F.2d 1108, 1111–12 (5th Cir. 1981)[3])).  In Florida,

> settlement agreements are favored as an efficient way to settle disputes and as a means to conserve judicial resources.  Courts will enforce them when it is possible to do so.  [They] are interpreted and governed by the law of contracts.  The party seeking to enforce a settlement agreement bears the burden of showing the opposing party assented to the terms of the agreement.

*BP Prods. N. Am., Inc.*, 469 F. Supp. 2d at 1133 (internal citations omitted).  A party seeking to avoid a settlement agreement based on allegations of duress bears the burden of proof.  *Shepard v. Fla. Power Corp.*, No. 8:09-cv-2398-T-27TGW, 2011 WL 1465995, at *3 (M.D. Fla. Apr. 18, 2011).

Finally, and relevant here, a party may not unilaterally repudiate a settlement agreement once it is reached.  *Reed by and through Reed v. United States*, 891 F.2d 878, 881 n.3 (11th Cir. 1990).  The Court "cannot

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit decided prior to October 1, 1981.

allow a litigant to attack the integrity of the settlement process by attempting to recharacterize the focus of his litigation after he decides he is unhappy with the settlement."  *Murchison*, 13 F.3d at 1487.

### B.   Discussion

The resolution of this motion is straightforward because Florida law does not embrace buyer's remorse when it comes to settlements. Notwithstanding the parties' irreconcilable stories of their settlement discussions, Plaintiff cannot escape the undisputed fact that he ratified the settlement when he accepted the $2,500 payment to his trust account and proceeded to spend the funds.  As such, the settlement agreement is valid.

It is a tenet of Florida contract law that a party ratifies a settlement agreement when he or she knowingly accepts the benefits of that agreement.  *See Hendricks v. Stark*, 126 So. 293, 296 (Fla. 1930) ("Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation….Any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm.").

Put differently:

Where a party accepts the benefits of a settlement agreement or a compromise of his case and knows, or in the exercise of due

17

> diligence should have known, of the facts concerning that
> settlement, the party ratifies the settlement by accepting the
> benefits whether the settlement was in the first instance
> authorized by him, and he is thereafter estopped to attack the
> settlement.

*Kisz v. Massry*, 426 So. 2d 1009, 1011 (Fla. 2d DCA 1983) (citing

*Nagymihaly v. Zipes*, 353 So. 2d 943 (Fla. 3d DCA 1978)); *see also*

*Zurstrassen v. Stonier*, 786 So. 2d 65, 71 (Fla. 4th DCA 2001) ("Ratification

occurs where a party with full knowledge of all the material facts makes an

affirmative showing of his or her express or implied intention to adopt an

act or contract entered into without authority." (citing *Deutsche Credit Corp.*

*v. Peninger*, 603 So. 2d 57, 58 (Fla. 5th DCA 1992))).  Federal courts have

recognized or applied the principle of ratification to contracts and

settlement agreements.  *See, e.g.*, *Whetstone Candy Co., Inc. v. Kraft*

*Foods, Inc.*, 351 F.3d 1067, 1076 (11th Cir. 2003); *Devoux v. Wise*, No.

3:12-cv-540-J-34JBT, 2014 WL 1457520, at *6 (M.D. Fla. Apr. 14, 2014);

*Sea-Land Serv., Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1262 (S.D. Fla. 1999);

*Mungin v. Fla. East Coast Ry. Co.*, 318 F. Supp. 720, 735 (M.D. Fla. 1970),

*aff'd*, 441 F.2d 728 (5th Cir. 1971).

So too here, where ratification fits neatly to the facts of this case.

Plaintiff was aware that he signed an agreement with Sergeant Perry and

Officer Braswell in February 2020 to resolve his claims against them for

$2,500, as evidenced by his signature on the written agreement.  ECF No. 124-1.  Although Plaintiff contends the agreement was the product of duress, this does not excuse his acceptance of the settlement funds into his DOC trust fund account on March 2, 2020, ECF No. 124-2, and his resident account at Blackwater C.I. on March 11, 2020, ECF No. 124-3. What's more, Plaintiff spent the funds to purchase items at the prison commissary and to obtain copies of his medical records for further litigation of his claims against Dr. Llorens and Nurse Phillips.

It is also obvious that Plaintiff knew he could move to have the Court set aside or vacate the settlement agreement due to duress at the time he received the funds because he submitted a motion arguing that particular point on March 6, 2020.  ECF No. 117.  Nevertheless, instead of returning the unspent settlement funds to the State of Florida (or just refusing to use them), Plaintiff began a spending spree before the Court even ruled on his initial motion to vacate.  This negates Plaintiff's arguments for relief from the settlement agreement.  *See Devoux*, 2014 WL 1457520, at *6 ("Plaintiff has never disclaimed the Defendants' obligations under the Settlement Agreement, only his own.  He is attempting to accept the benefits of the Settlement Agreement and renounce only the burdens.  This he may not

do.").  Plaintiff's studied silence on the issue of ratification in response to the instant motion speaks volumes.

The Court, therefore, concludes that Plaintiff ratified the settlement agreement when he accepted the monetary benefit from it.  As to the remedy, Plaintiff agreed to discharge Sergeant Perry and Officer Braswell from this case in exchange for the $2,500 payment he has already received.  That promise is due to be enforced.  Instead of compelling Plaintiff to execute a joint notice of voluntary dismissal, the Court will dismiss Plaintiff's claims against Sergeant Perry and Officer Braswell with prejudice.

## III.  DR. LLORENS AND NURSE PHILLIPS' MOTION FOR SUMMARY JUDGMENT

Dr. Llorens and Nurse Phillips move for summary judgment on Plaintiff's three claims concerning his medical treatment at Cross City C.I. ECF No. 126.  First, Dr. Llorens argues that he was not deliberately indifferent to Plaintiff's ankle fracture because Plaintiff received adequate and timely medical treatment, namely an examination, x-ray, pain medications, and referral to a specialist (Dr. Esquiva) without any exorbitant delay.  *Id.* at 9–10.  Second, Nurse Phillips argues that Plaintiff's state-law negligence claim is due to be dismissed because Plaintiff failed to

satisfy the pre-suit requirements set forth in Florida's Medical Malpractice Act, Fla. Stat. § 766.106.  *Id.* at 10–14.

Plaintiff avers that Dr. Llorens is not entitled to summary judgment on his deliberate indifference claims because Dr. Llorens failed to prescribe effective pain medication (notwithstanding multiple complaints by Plaintiff), inexplicably delayed referring Plaintiff to Dr. Esquiva, and interfered with Dr. Esquiva's treatment of Plaintiff's ankle fracture.  ECF No. 127 at 8, 10–19.  Moreover, Plaintiff argues that he notified Corizon Medical Services and DOC of his intent to sue in 2016 (ECF No. 62-1) but could not obtain a corroborating expert opinion because they failed to make his medical records available upon request.  ECF No. 127 at 20–21.

## A.    Legal Standard

The entry of summary judgment is appropriate when the Court is satisfied "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988).  "The nonmovant need not

21

be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the movant bears the initial burden of establishing the nonexistence of a triable issue of fact.  This, however, does not require the movant to disprove matters on which the non-moving party bears the burden of proof at trial.  *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994).  "[T]he moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *United States v. Four Parcels of Real Property in Green and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991) (alterations adopted).

If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.  *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005).  In civil actions filed by inmates,

> [federal courts] must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgement stage.

*Beard v. Banks,* 548 U.S. 521, 530 (2006) (internal citations omitted).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

## B.    Discussion

### (*i*)    Deliberate Indifference

Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  To state a claim for deliberate indifference, a plaintiff must allege: (1) a serious medical need; (2) deliberate indifference to that need by the defendant; and (3) causation between the defendant's indifference and plaintiff's injury.  *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).

23

The seriousness of a medical need is an objective inquiry.  *Kelley v. Hicks*, 400 F.3d 1282, 1284 (11th Cir. 2005).  A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition.  In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

Whether a defendant acted with deliberate indifference is a subjective inquiry.  *Kelley*, 400 F.3d at 1284.  The plaintiff must establish: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).  The Constitution does not require medical care provided to prisoners to be "perfect, the best obtainable, or even very good."  *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991). Instead, the treatment (or lack thereof) must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness[.]"  *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

"Conduct that is more than negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011). Federal courts are reluctant to find a defendant was deliberately indifferent when the prisoner received medical treatment unless such treatment was grossly incompetent. *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). In the same vein, a prisoner cannot show deliberate indifference when he receives a medical diagnosis and care but desires a different diagnosis or treatment. *Harris*, 941 F.2d at 1505; *see also Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[A]s *Estelle* teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.").

When a deliberate indifference claim is based on delay of treatment, the Court will examine "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007). However, "[a] prisoner must provide verified medical evidence to establish

25

the detrimental effect of delay in medical treatment." *Visage v. Woodall*, 798 F. App'x 406, 410 (11th Cir. 2020) (alterations adopted).

Plaintiff contends that Dr. Llorens was deliberately indifferent to his ankle injury and subsequent chronic severe pain, which he says resulted in deformity and continues to hinder his physical activity. Because Dr. Llorens—at this juncture—does not dispute that Plaintiff had an objectively serious medical need for treatment, and Plaintiff made contemporaneous complaints to Dr. Llorens about his ailments, this case boils down to whether there is evidence from a which a reasonable jury could find that Dr. Llorens' conduct amounted to anything more than mere negligence. There is not, and, therefore, Dr. Llorens is entitled to summary judgment.

For starters, the record belies any claim that Dr. Llorens was deliberately indifferent to Plaintiff's initial ankle injury. When Plaintiff was taken to the medical department and examined by Nurse Phillips on the early morning of March 14, Dr. Llorens began a course of treatment that included regular radiographic imaging (x-rays), pain medication, mobility aids, and scheduled follow-up examinations. Dr. Llorens observed Plaintiff's injury, reviewed his x-rays, and referred him for a consultation with an orthopedic specialist. Lastly, Dr. Llorens surmised from Plaintiff's July 15 x-ray and his own observation of Plaintiff's normal range of motion

that Plaintiff's fracture was healed and did not require further treatment by him or Dr. Esquiva.  Upon close examination of the record, there was nothing grossly inadequate about Dr. Llorens' treatment.[4]

Plaintiff asserts repeatedly that it should have been obvious to Dr. Llorens from the appearance of Plaintiff's right ankle and foot that he misdiagnosed Plaintiff's initial ankle injury.  This is a non-starter.  Plaintiff's assertions are conclusory, and he fails to point to any evidence demonstrating a different diagnosis.  To the contrary, Plaintiff's x-rays have been consistent with Dr. Llorens' initial diagnosis of an ankle fracture.  Plaintiff, instead, points to Dr. Esquiva's comment that his fracture healed in a displaced manner and the 2019 x-ray showing "chronic medial malleolar fracture deformity" as evidence that Dr. Llorens' treatment failed.  However, deliberate indifference is more than "negligence in diagnosis or treatment."  *Sifford v. Ford*, 701 F. App'x 794, 796 (11th Cir. 2017); *see also Stewart v. Pa. Dep't of Corr.*, 677 F. App'x 816, 820 (3d Cir. 2017) (the

---

[4] Even accepting as true—as the Court must at this stage—that Dr. Llorens was hostile toward Plaintiff or insulted him during his medical visits, that does not establish a claim for deliberate indifference in violation of the Eighth Amendment.  *See Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) ("[A]llegations of verbal abuse and threats by the prison officers did not state a claim because the defendants never carried out these threats and verbal abuse alone is insufficient to state a constitutional claim."); *O'Connor v. Jones*, No. 3:18-cv-1423-J-39PDB, 2021 WL 118982, at \*4 (M.D. Fla. Jan. 13, 2021) ("A claim that a prison official was mean to a prisoner is frivolous" because rudeness and hostility toward a prisoner "does not offend Eighth Amendment principles").  At bottom, Dr. Llorens' "bedside manner" is not in issue.

initial misdiagnosis of a prisoner's ankle fracture is "at worst … medical malpractice, which is not actionable under the Eighth Amendment"). Because Plaintiff received medical treatment and cannot establish anything more than a potential error in medical judgment by Dr. Llorens, his deliberate indifference claim concerning the diagnosis and treatment of his initial ankle fracture must fail.

Plaintiff also misses the mark with his claim that Dr. Llorens was deliberately indifferent by delaying Plaintiff's referral to Dr. Esquiva. Dr. Llorens' decision that the consultation was "routine" rather than "urgent," which was made while Dr. Llorens was already treating Plaintiff's injury, is insufficient to establish deliberate indifference. *See King v. Lawson*, No. 5:17-cv-303-TES-CHW, 2020 WL 1227760, at *2 (M.D. Ga. Mar. 13, 2020) ("Presumably, Lawson could have marked Plaintiff's eye issue as 'urgent' sooner than she did; thus, expediting the consultation. However, Plaintiff has not presented evidence that Lawson's determination not to mark 'urgent' … was more than gross negligence."). Moreover, Plaintiff has failed to put forth any verified medical evidence, such as medical records or a declaration from a treating medical provider, suggesting that the three-week delay before his appointment to meet with Dr. Esquiva was detrimental to his recovery. The absence of such evidence at the summary

judgment stage is fatal to the instant claim.  *Owen v. Corizon Health, Inc.*, 703 F. App'x 844, 848 (11th Cir. 2017).

This leaves Plaintiff's claim that Dr. Llorens was deliberately indifferent to his persistent complaints of chronic severe pain in his right leg, ankle, and foot following his initial ankle injury.[5]  It is undisputed that Dr. Llorens responded to Plaintiff's complaints by prescribing him Ibuprofen and changed his prescription to Naproxen and Excedrin at Plaintiff's request.  Although Plaintiff insisted that Naproxen and Excedrin were also ineffective and that he could not tolerate Naproxen, Dr. Llorens decision not to prescribe a different medication for pain management was well within his discretion as a medical professional.  *See Ross v. Corizon Med. Servs.*, 700 F. App'x 914, 916 (11th Cir. 2017) ("The failure to administer stronger medication is generally a medical judgment that is not an appropriate basis for imposing liability."); *Monteleone v. Corizon*, 686 F. App'x 655, 659 (11th Cir. 2017) ("[D]etermining which medication to prescribe is generally a matter of medical judgment[.]"); *Hernandez v. Sec'y Dep't of Corr.*, No. 11-14420-CIV, 2014 WL 11444109, at *14 (S.D. Fla. Feb. 10, 2014), *aff'd*, 611

---

[5] Although it is unclear whether Plaintiff's chronic severe pain arose directly from his initial ankle injury or subsequent injuries to the same area, "severe pain resulting from the willful denial of … necessary medical care offends the Constitution, even without any showing that [P]laintiff's underlying medical condition was worsened or exacerbated." *Newsome v. Prison Health Servs., Inc.*, No. CV405-042, 2009 WL 1469203, at *6 (S.D. Ga. May 26, 2009).  Therefore, the Court separately considers this claim.

F. App'x 582, 584 (11th Cir. 2015) ("The decision to withhold certain narcotic medications for the brief time or suspend use of a certain medication altogether, at worst, constitutes mere medical malpractice."). Plaintiff, thus, cannot establish that Dr. Llorens' decision to prescribe Ibuprofen, Naproxen, or Excedrin to Plaintiff for his chronic severe pain—even over Plaintiff's complaints about the efficacy and effect of the medications—was grossly inadequate to constitute deliberate indifference. *See Monteleone*, 686 F. App'x at 660 ("Although Dr. Alvarez's failure to substitute a more effective medication may constitute negligence, it does not rise to the level of deliberate indifference.").

Because Plaintiff has failed to demonstrate that a reasonable jury could find Dr. Llorens provided grossly inadequate care for Plaintiff's ankle injury and subsequent chronic severe pain, or that he unreasonably delayed referring Plaintiff to Dr. Esquiva for treatment, Dr. Llorens is entitled to summary judgment on Plaintiff's deliberate indifference claims.

(*ii*)    *Negligence*

"Before filing any claim for personal injury … arising from medical malpractice, Florida law requires the claimant to conduct an investigation of the claim and send the defendant notice of intent to sue, along with a corroborating opinion by a medical expert."  *R.W. Armor Corr. Health*

*Servs., Inc.*, 830 F. Supp. 2d 1295, 1302–03 (M.D. Fla. 2011); *see also* Fla. Stat. §§ 766.104, 766.106, 766.203.  Failure to comply with the statutory prerequisites prior to the expiration of the two-year statute of limitations mandates the dismissal of the medical negligence claim.  Fla. Stat. § 766.206(2); *Kurkal v. Mekras*, 679 So. 2d 278, 283 (Fla. 1996); *see also R.W.*, 830 F. Supp. 3d at 1303.

Plaintiff does not dispute that he is subject to Florida's pre-suit requirements but argues instead that he was relieved from producing a corroborating expert opinion when Corizon Medical Services and DOC failed to provide him copies of his medical records upon request.  ECF No. 127 at 20–21.  Plaintiff relies on Florida Statutes section 766.204(1), which provides that "[c]opies of any medical record relevant to any litigation of a medical negligence claim … shall be provided to a claimant … at a reasonable charge within 10 business days of a request for copies."  Fla. Stat. § 766.204(1).  Failure to do so at a reasonable charge constitutes a waiver of "the requirement of written medical corroboration by the requesting party."  Fla. Stat. § 766.204(2).

Plaintiff requested copies of his medical records from DOC, not Nurse Phillips, on July 16, 2016, August 6, 2016, October 6, 2017, and November 9, 2017.  ECF No. 127-3.  Each time, he received a response in less than

31

10 business days advising him that copies of his medical records were available to him at a cost of $0.15 per page.  *Id.*  Section 766.204 contemplates a reasonable charge for copies of a claimant's medical records, and, thus, Plaintiff was not entitled to his records free of charge. Conversely, DOC's response to his request for records was appropriate and did not waive the requirement that Plaintiff produce a corroborating expert opinion prior to filing this action.

Because Plaintiff refused to pay for copies of his medical records— and there is no suggestion that a charge of $0.15 per page is unreasonable[6]—Plaintiff's negligence claim against Nurse Phillips is due to be dismissed for failure to comply with Florida's pre-suit requirements for medical malpractice claims.

## IV.  CONCLUSION

Accordingly, it is **ORDERED**:

1.      Sergeant Perry and Officer Braswell's Motion to Enforce the Parties' Settlement Agreement, ECF No. 124, is **GRANTED**.

2.      Dr. Llorens and Nurse Phillips' Motion for Summary Judgment, ECF No. 126, is **GRANTED**.

---

[6] *See generally* Fla. Admin. Code R. 64B8-10.003 (any person licensed under Chapter 48 required to release copies of patient medical records "may condition such release upon payment by the requesting party of the reasonable costs of reproducing the records[,]" which includes $1.00 per page for the first 25 pages and $0.25 for each additional page).

3.      The **Clerk** is directed to **TERMINATE** Plaintiff's "Motion to Set Aside and Vacate Settlement Agreement," ECF No. 130.

4.      The **Clerk** is directed to enter a judgment stating, "Plaintiff's Third Amended Complaint, ECF No. 78, is **DISMISSED with prejudice**." The **Clerk** must then close the file.

**DONE AND ORDERED** this 5th day of March 2021.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge